We're now 23-2404, Doles v. HHS, Ms. Maglio. May I please report? My firm, MCT Law, represents the appellant, Ms. Elizabeth Doles. Ms. Doles suffered a vaccine injury when her vaccinations triggered her pre-existing but clinically silent MS, causing it to become overt. At that stage, she experienced active MS symptoms. Could I see if we're on the same page? As I read the government brief, they agree that you're right about the Langer-Gould study in the sense that it does say something about manifestations about MS. And if I understand, I'll ask them about this. But as I understand it, they're saying, well, the judge was right with respect to the Langer-Gould study for only two reasons. One, the study didn't cover older people such as your client. And second, that the injury wasn't manifested within the 30-day period covered by the Langer-Gould study. But otherwise, if I understand them correctly, they agree that the study is relevant, save for those two qualifications. Is that the way you understand what they're saying? Yes, I believe so, Your Honor. And what the Langer-Gould study did make that finding as a statistically significant finding in terms of the age of the study group that they found statistically a relationship that was statistically significant and the timing of the symptoms after the receipt of vaccination. However, this court has stated and drew in other cases that that finding of statistical significance is not what binds special masters to a consideration of whether a study supports proof of causation. Did your expert, Dr. Steele, say that nonetheless he found the study to be relevant? Yes, Dr. Steele relied on the study and he relied explicitly on the study's conclusions, which went beyond their statistically significant findings. Could we just back up for a second and get framed out what your often long-loving for theory is? Yes. I know that Langer-Gould is involved, but there was also talk about the T cell theory. So can you just tell us what you believe Steele's often long-loving for theory was about why this shot aggravated the condition?  Causation of aggravation. And so I don't believe that, or Dr. Steele discussed mechanism to some extent, but what his theory was, under loving prong four, was that it was a sound and reliable theory, was that vaccination could trigger the onset of active symptoms, clinical symptoms. Those were T cell activities? Dr. Steele speculated or suggested that it could be, as did the Langer-Gould study, that it could be through T cell activation, bystander activation, molecular mimicry. And Langer-Gould especially looked at all of those different things and said that akin to an infection, a vaccination could trigger the onset of symptoms in a period of time after the receipt of the vaccination. Akin to the infection is because of the T cell and the theory of the molecular mimicry, correct? That is correct, Your Honor, and if you'd like me to, I can look at Langer-Gould specifically on that. No, no, I'm trying to focus away from Langer because the way in which the case was taken around for the first time by the Court of Federal Claims is if it all relied on Langer, and then faulting Langer for the various reasons. But it looked to me as if when you read the way the decision is put together, Langer follows after the discussion of molecular mimicry and that sort of thing. So if you're looking at the first decision by the special master in his analysis of prong four, right? Yes, sir. Because he has a specific section on prong four. If you look at the bottom of page 141, he's talking about various theories. He comes over and says, in that context. So if you turn to page 142, Langer-Gould is arising in the context of a previous explanation. Correct, Your Honor. So is it your view that Langer-Gould isn't necessarily the only reason for the theory? Yes, Your Honor. And that is also evidenced by the second decision of the special master, where he reviewed the evidence in accordance with the remand instructions, and he excluded Langer-Gould from the consideration. And he talked about Dr. Steele's expert report. He talked about Dr. Sriram's discussion of MS. Didn't Dr. Steele's opinion make it seem like your client experienced a post-vaccine attack separate from the underlying MS? I mean, that was my confusion about reliance on Dr. Steele. Dr. Steele, and certainly the special master noted, Dr. Steele's opinion included aspects that talked about TM or APTM as a separate event. He also talked about it being in the context or related to the MS. So there was, as the special master said, some tension in Dr. Steele's expert report. And the special master noted that and then looked at the additional case studies and the additional research that was presented and found that Dr. Steele had been talking about the AP TM or the TM, that separate event, that acute event, in the context of the overall chronic disorder, which was the ongoing MS, which had been subclinical, no experience, no symptoms experienced, but the radiological findings found that there had been the beginning of lesions in the brain and then the vaccinations as triggering that onset of active symptoms and the acute event. So, yes, Dr. Steele talked about it as a discrete event, but he also talked about it in the context of MS. And he talked about how AP TM is strongly associated with... Part of the confusion initially as to whether this case was going to go off on actual cause or whether it was going to go off on aggravation and looking at the events, correct? That is correct, Your Honor. I mean, at this stage in the game, we have an often one-loving-four case. Isn't that correct? The only thing is question. Right. And you are directly attacking the Court of Claims' first decision that upset Special Master Horner's first decision, correct? That is correct. If we were to decide that you're correct and that the first Special Master's decision was not arbitrary and capricious on the prong one-four, then you don't have to prove anything else, correct? That is correct, because Special Master Horner found the other prongs were met. But wait a minute. Wasn't one of the bases upon which the Court of Federal Claims relied in reversing the first decision that the Special Master herself or himself came up with this aggravation theory and it's one that the government never even had a chance to respond to? So wasn't there an independent... Even if we disagree with the line of goal setting, there was an independent basis which the Court of Federal Claims could have correctly vacated that opinion, right? And that is correct. And that was argued before the Court of Federal Claims, and there was points in the record that pointed to significant aggravation being... It was a pled cause of action, and it was also referred to both by the prior Special Master, the Special Master prior to Special Master Horner, and even as Special Master Horner pointed out in appendix, I believe it's page 70, in his second decision that it had been referred to in the initial briefing by the respondent. But in addition to that, Your Honor, I would suggest that when the Court of Federal Claims remanded the case, based on the two points, you're right, the fundamental fairness issue of whether significant aggravation had been significantly brought up between the parties and whether the respondent had had enough opportunity to brief it, and the second point on the Langer-Gould study, that that problem, what he... The remand instructions were to...  Exactly. It's been cured. I'll say it hasn't had an opportunity to... Right. Can I ask you kind of just a legal question on what... Your briefing, the case law... You rely on case law in your briefing supporting affirming a fact-finding as long as the evidence on which it is based is not wholly implausible. Correct. But we've also said that a plausible medical theory is not sufficient. It needs to be probable. So how do you reconcile those two? Because at this point, we're talking about the plausibility of the evidence and also whether the other arbitrary and capricious standard cases also talk about the special master considering all of the relevant record evidence, not drawing or... Yes, not drawing implausible... Yeah, but I think, as Judge Probst is pointing out, I think there are two different issues here. One is the standard of review of the special master, which is, I think, established that its plausibility is the standard of review. I'm not sure that's right, but our case law establishes that, I think. But I don't think our case law establishes that the special master has to rule in favor of the claimant if the claimant presents plausible evidence. I think those are two different things. And in this case, the standard of review does look to whether the special master made any implausible inferences. In the Langer-Gould study, the special master took the conclusions from the study verbatim. Both special masters did. Could we talk for a minute about the third special master decision, the special master Holder's decision, which you also rely on? And she said that she would have found in your favor on prong four of loving if she'd been allowed to consider the Langer-Gould study. As to prong five of loving, though, she doesn't seem to reach that. Is it your view that if her finding is to prong four is sustained, that she would necessarily have to find under prong five in your favor? She would need to find under prong five, but I would suggest that her discussion of prong five is that she found there was that prong six evidence was highly probative on prong five. So she found there was highly probative evidence supporting prong five. But at the end of the day, she concluded she could not establish prong five or rule in favor of petitioner on prong five simply because of the prong four analysis, because she could not consider Langer-Gould. So she suggests at Appendix 44 that there was highly probative evidence on prong five and that she would find that way. And she also suggests in her footnote that she was setting forth her analysis to avoid the need for remand. So her suggestion is that this should be considered a full and complete opinion that doesn't need to be remanded for further review if she had been permitted to consider Langer-Gould. Can I ask you a question about the Langer-Gould study in particular? Yes. I was looking at, this is on Triad Appendix 2206, dealing with the analysis of the MS patients in particular in Figure 2, 2B. It looks to me like there's at least one patient in Ms. Dole's age group that had the first manifestation in the time period, 42 days. Yes, Your Honor. It looks to me like there's one person in that, and not very many elderly people were examined in that study, but there's at least one that was right on her case. That's correct, Your Honor. And that makes this circumstantial proof evidence tending to prove that there could be an association. And what the study authors conclude is that- And it went out to 90 days. Beyond her 42, there are four more. Yes, Your Honor. And what the study authors were, in their conclusions, what they were stating is that their study findings didn't suggest that the vaccinations would trigger a person becoming or experiencing symptoms of MS. It wouldn't trigger MS as a disorder entirely, but it would trigger the onset of symptoms in a person who already had a self-care group. They were looking to see whether or not they could establish a connection between the vaccines and causation of MS. They said that was the purpose. But when they concluded- And, of course, we haven't been able to prove that, but in essence said, gee whiz, look what we did find. We did find that if you were administering a range of these vaccines to people, you're going to trigger MS symptoms in various time periods. Correct? That is correct. And they surmised that that possibly could show that there was an exacerbation or an aggravation of an underlying condition. Right, a triggering of the symptoms. And they also found on Appendix 2307, they stated, our findings are consistent with vaccines acting as a pro-inflammatory cofactor in individuals with subclinical autoimmunity because this mechanism- and, again, they refer back to the T cells- would be expected to hasten symptom onset but not change the long-term risk of developing MS or CIS. And so that's exactly what their conclusions are. They're finding they're consistent with the case reports that anecdotally have stated that after receipt of vaccination, there can be an onset of symptoms. And they're stating that it is consistent with vaccines acting in the same way that infections have been found to act as being a factor that could trigger the onset of symptoms. Okay, I think we're out of time. So we'll give you two minutes for rebuttal. Thank you, Your Honor. Ms. Stuller. Good afternoon. May it please the Court. While review of the factual findings made by- Is the statement I made earlier about your position accurate, that you now agree that the only reasons for setting aside the Langer-Gould study are one, the age aspect of it, and two, the number of days for manifestation of symptoms? Yes, because Petitioner does not fall within the groups where they found it increased in risk. Okay, and so to the extent that the special master relied on other aspects of Langer-Gould, he was wrong about that? I'm sorry, can you repeat the question? To the extent that the Court of Federal Claims judge ruled out Langer-Gould for other reasons, he was mistaken, right? I'm not quite sure what other reasons you're referring to. Well, he seemed to think that it didn't show anything about MS or MS manifestation, and I think he was wrong about that, and as I read your brief, you agree that he was wrong about that aspect of it. Well, we say that there's no association between vaccines and MS onset that Langer-Gould found, and so I think the CFC was correct in finding that was the conclusion of the study. Well, wait, now I'm confused, because I thought you just agreed with me that the only basis for setting aside the study were the age limitation and the days limitation. Yes, those are the two main reasons. But he went beyond that, and he said Langer-Gould doesn't tell us anything about manifestation of MS, and that's wrong, right? No, I agree with the Court of Federal Claims that the Langer-Gould study doesn't tell us anything about the manifestation of MS, because the conclusion— Even for the 30-day time period and for the age group? Right, because that finding was limited to all central nervous system acquired to myelinating syndromes. Which includes MS. It includes MS, but it's not specific. It's not a finding that's specific to MS. But to the extent that he seemed to rule out the study on the ground that it had nothing to do with MS, he's wrong about that, because the study considers a group of conditions, including MS, whose manifestation can be triggered by vaccines for the right age group for the right time period, right? Sure, and I understand what you're saying, yes. Yeah, okay. And so with respect to the Oehler study, do you agree that if we say that he was wrong about the Langer-Gould study, that we should affirm or we should hold that the causation was established under the findings made by Special Master Oehler? If you allow Special Master Oehler to rely upon the Langer-Gould study in the way that she proposed, I agree that the government would not prevail in this case. So it's not an affirm, it's a reverse. It would be, yeah, it would be a reversal of her findings, because she— No, it would be a reversal of the Court of Federal Claims. Yes. But isn't the result the same if we just agree, if we found that the first decision by the Court of Federal Claims was wrong on the theory issue? I mean, Judge Dike was the presiding judge referring to the Oehler opinion, and Oehler comes in later on, but I mean, the first decision by the first Special Master found all elements of a loving claim shown, right?  And the only missing element would be, you know, 1-4. Right, so— I mean, I don't—it looked to me as if the way the adversary was presenting the case first was to say, decide first whether the Court of Federal Claims was right in the very first instance, because if they were not right in the first instance, then all the rest of the case is mooted out. There wasn't any need for a remand, et cetera, correct? I mean, I think that that's correct, except there was a conversation earlier about the fact that within the first—for the first go-around, the government had not had an opportunity. What's before us? What do we have? I don't—we're using the word jurisdiction, but what's before us? Is it just this last Court of Federal Claims opinion? No, I think it's all of it. I mean, we have the initial entitlement ruling. We have the ruling on remand that Special Master Horner gave. We then have Special Master— She never had a chance to appeal any of the previous decisions by the Court of Federal Claims because they weren't final. That's correct. So she starts, as I believe, correctly to say, let's start at the very front of the case and say, was the first action by the Court of Federal Claims correct? Right. Because if it was wrong, the Special Master had found all the elements of the claim of a loving claim met, and the only claim that was being challenged as not met was the theory, right? Right. And if we reverse and say the theory was correct, you don't need to go on past the very first decision by the Court of Federal Claims. Yes, I believe that's correct. I mean, you would get out the same way if you were relying on Aller's findings later on, I think. But you don't need—and the notion that the government was prejudiced by not knowing that this was going to be an aggravation case, you're not arguing that that claim has any legs at this stage in the game? That's correct, because we had an opportunity to— And the record was closed. The record never reopened from the first Special Master's decision. Actually, the record was opened on first remand. But it was opened not on the Olson Part IV issue. No, it was. In what respect? Judge Schwartz said that the parties could offer additional evidence on the significant aggravation theory on remand. And what was offered? The parties didn't offer any additional evidence. That's what I mean. So the record was closed. After they, yes, declined to offer— What I'm saying, the record on the question of whether or not the theory prong was satisfied was that all the evidence in the record was in the first go-around in front of Judge Horn. Right, that's correct. Yes, they were invited to submit, but none was submitted. Correct. I mean, it just seemed to me that the government—the argument that the government was denied due process, if that was true by the first decision, that issue is just totally mooted out. It doesn't exist anymore. That's correct. Thank you. So what's wrong with the T cell theory? I mean, we've seen that expressed in other cases where they say this molecular mimicry, basically what happens is T cell activity is shown to attack the myelin protective cell around the nerves. This can activate activity. And lo and behold, you see in the Langer-Gould study that there are lots and lots of manifestations of various demyelinating diseases within relative time frames from the administration of the vaccines. Well, I think what— And Langer-Gould is relying on that theory itself, clearly in it, talking about molecular activity, C cell activity, and then making a general finding that it is possible that this is an aggravating event. Well, I think what's wrong is that the conclusions that Langer-Gould reached were limited to that specific population. So it was only patients who were younger than 50 years old. Petitioner was 67. And only patients who had onset within 30 days of vaccination. Petitioner, in this case, had more than 40 days. And it was only happening often enough to allow him to make a prediction. Yeah, there was no statistically significant finding in this study that's relevant to Petitioner. And I think Judge Schwartz was correct to say that without any association, you cannot have this study support a causal theory. I have problems with that because it seems to me that, first of all, as the record shows, that it would be hard to design a study for 67-year-old people just because MS doesn't appear very often with respect to 67-year-old people. And then, you know, the fact that manifestation is 14 days after the 30-day period seems to me to be relevant, but not dispositive in terms of excluding the study. I mean, studies all the time have to be extrapolated. And I think, didn't Dr. Steele say why this study was relevant? And isn't the study circumstantial evidence to support the petitioner's position? No, I don't think that the study is circumstantial evidence. Dr. Steele talked about the study only with respect to TM, so only with respect to transverse myelitis and whether or not you could see an increase in transverse myelitis, not MS. And he also said that there wasn't sufficient evidence to support the conclusions that the Lingergold authors reached with regard to the idea that vaccines could somehow take underlying autoimmunity and render it overt. So you don't see Lingergold as being possibly substantial evidence of what I refer to as the T cell theory? No, I do not see Lingergold to be particularly relevant at all in this case, given petitioner circumstances. But the first time around, Judge, Special Master Horner, as I pointed out, was discussing first the molecular structure theory. And then he says, in this context, I'm looking at Lingergold. Yeah, and so I might respond. He doesn't say start off by saying Lingergold proves all this. He has a theory that he says in that context, look at Lingergold. But Lingergold doesn't serve as evidence for petitioner's theory, because petitioner was 67 and had onset more than 40 days after vaccination. And petitioner could have gone out. The question is whether Lingergold serves to teach any information. Is it valuable for any purpose in teaching any information about the subject of the issue? I mean, I don't think so. I think that the study needs to be relevant to petitioner. Can I add, you may not know this, but is there on the table, do they include the population that was covered and the time frame that was covered by Lingergold? Is that considered an on-table case? I'm sorry, are you talking about the vaccine injury table? Yes. And can you repeat your question? If the population for Lingergold and the age population and the time, is that a table injury? No, that's not a table injury. This is all off-table. Even the population covered by Lingergold is not an on-table. So the table has injuries that are specific to the vaccination. I'm not thinking, you know, offhand. I'm not aware of any age limitations that the table puts on recovery for certain injuries. I mean, I think you can say things like the rotavirus vaccine are traditionally given to children. And so it would be extremely unusual to have an adult table for rotavirus intussusception. And this is just a random question because I've been doing these cases and I should know the answer to this. But do table injuries include aggravation too? Separate things for aggravation as opposed to causation? Yes, you can have an on-table significant aggravation case. Thank you. So the government's view of what's evidence in these vaccine cases seems to me to be awfully cramped. That if you have evidence that a 50-year-old can develop MS symptoms as a result of a vaccination, I mean, why can't you say that that's some evidence that a 67-year-old would have the same result? It doesn't seem to me that the Lingergold study somehow suggests that there's something unique about young adults. And to extrapolate from that and say, well, if it affected a 50-year-old, it probably also affected a 67-year-old, that seems to me within the realm of relevant evidence. And for you to say that because the study didn't specifically deal with 67-year-olds, that it's irrelevant, seems to me probably not correct. Well, the reason why Lingergold bifurcated its study population into younger than 50 and 50 and above is because they were specifically interested in how age affected the onset. And they were looking at age as a factor. The Lingergold study doesn't suggest that a 50-year-old is more likely to develop symptoms than a 67-year-old, right? Well, they only found an increased risk in the population that was less than 50. Well, they didn't have very many 67-year-olds. Well, Petitioner could have offered another study if they had desire that addressed a study population that was more relevant to her age. Doesn't seem to me that's the way medicine works. If you have a study that shows there's a strong likelihood that a 50-year-old would develop symptoms, if you were a physician, you'd worry about a 67-year-old also, wouldn't you? But it doesn't change the fact that this study didn't make any findings regarding 67-year-olds that were statistically significant. Although there were actual somebody very much like Ms. Doles in the study, right? Had the vaccine and had the effect within the 14-day period. But I don't believe that that individual was in the age group of Ms. Doles. I'm just saying, as a matter of just counting people that had the symptoms, there is a 42-day example in the MS where there were at least one person had the adverse symptom. I mean, it's true that, yes, there was one person who had that. And then if you go from 42 days to 90 days, which is just not a great leap, you find another four. Over 50. I mean, but these were not statistically significant findings. Those are just data points. They weren't findings that were sufficient to allow you to make an odds guess, right? But I'm just saying they are people who were studied in the case and they read right on Doles. Right. Okay. Thank you. Ms. Magliel, you have two minutes. Thank you. Langer-Gould provides supportive evidence under this court's precedent regarding circumstantial evidence and what is supportive of causation. And in cases such as Alton and Andrew, the circuit has discussed how circumstantial evidence can be provided to prove causation. And has gone on to state that the preponderance standards only requires legal probability, not medical or scientific certainty. And in Andrew, the court talked about how scientific certainty is very near certainty, whereas preponderance is more likely than not. And in discussing the type of evidence that can support causation, Andrew stated that medical literature cannot be viewed through the lens of the laboratorian, but can't be viewed as requiring scientific certainty. It has to be viewed as allowing for the notion of circumstantial evidence, the notion of preponderant evidence. And here, the Langer-Gould study made several findings that would apply as preponderant evidence supportive of causation in this case, that would apply to the petitioner here. And they found that, in their conclusions, they found that vaccines like infections may accelerate the transition from subclinical to overt autoimmunity in patients with existing disease. And that is akin to what Dr. Steele said. He said that there was a chance that this onset of symptoms, this acute symptom, the TM, would occur in the context of the underlying MS. And Langer-Gould also stated that their conclusions supported clinical anecdotes that central nervous system, demyelinating disorders, could have symptom onset shortly after vaccination. All of this goes to causation, and it goes to show that petitioner's case was supported on loving prong four. I think we're out of time. Thank you, Your Honor. Thank you. Thank both counsel.